JENELLE WELLING (SBN 209480)
Email: jenelle@rdlaw.net
**ROSSI DOMINGUE LLP**
East Bay Office *(service/mailing address)*
3201 Danville Blvd., Suite 172
Alamo, CA 94507
Tel: (408) 495-3900

Silicon Valley Office
1570 The Alameda, Suite 316
San Jose, CA 95126

Attorneys for Plaintiff

THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OMNITY CONSULTING, LLC d/b/a HARLEM SHAKE (WEST 124TH STREET), individually and on behalf of all others similarly situated,<br><br>　　　　Plaintiff,<br><br>v.<br><br>DOORDASH, INC.,<br><br>　　　　Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>Jury Trial Demanded<br><br>Action Filed:  February 16, 2024 |

Plaintiff Omnity Consulting, LLC d/b/a Harlem Shake (West 124th Street) ("Plaintiff"), through the undersigned attorneys, brings this lawsuit against Defendant DoorDash, Inc. ("Defendant" or "DoorDash") as to Plaintiff's own acts upon personal knowledge, and as to all other matters upon information and belief.

## SUMMARY OF THE CASE

1.　　　Plaintiff alleges that Defendant has violated the Administrative Code of City of New York, § 20-563.3, New York Local Law No. 52 of 2020, and New York Local Law No. 88 of



2020 by charging food service establishments, like Plaintiff, unlawful and excessive third-party food delivery service fees.

2.      On May 13, 2020, the New York City Council passed emergency legislation placing a cap on the exorbitant delivery fees that third-party delivery companies, such as Defendant, was charging restaurants for their services.

3.      Effective June 2, 2020, Local Law No. 52 of 2020, Council Int. No. 1908-B of 2020 (the "Delivery App. Legislation") placed a twenty percent (20%) cap on total fees that Defendant could charge restaurants with a specific cap of fifteen percent (15%) on all fees charged for delivery and a five percent (5%) cap for any additional fees including for marketing, credit card processing or any other fees.

4.      The Delivery App. Legislation was amended pursuant to Local Law No. 88 of 2020, Council Int. No. 2054-A of 2020 (the "Amended Delivery App. Legislation"), effective September 14, 2020, to allow for "pass-through" costs, such as credit card fees, to be charged to the restaurant above the fifteen percent (15%) and five percent (5%) fee caps.

5.      These limits were added to the New York City Administrative Code § 20-563.3 in 2021.[1]

6.      Since 2020, Defendant has intentionally and repeatedly charged Plaintiff, and, on information and belief, other members of the putative Class, fees in excess of those permitted under the governing regulations.  By virtue of Defendant's unlawful conduct and practices described herein, Plaintiff and the proposed Class have suffered injury and damages.  Plaintiff seeks damages, restitution, declaratory and injunctive relief, and all other remedies this Court deems appropriate.

## PARTIES, JURISDICTION AND VENUE

7.      Plaintiff is a corporate citizen of New York.  It is a New York limited liability company maintaining its principal place of business at 100 West 124th Street, New York, New York 10027.  Plaintiff is a restaurant operating under the name Harlem Shake.

---

[1] https://codelibrary.amlegal.com/codes/newyorkcity/latest/NYCadmin/0-0-0-134606


ROSSI
DOMINGUE
LLP

**CLASS ACTION COMPLAINT**

8.      DoorDash, Inc. is a corporate citizen of Delaware and California.  It is a Delaware corporation maintaining its principal place of business at 303 2ⁿᵈ Street, South Tower, Suite 800, San Francisco, California 94107.  Its registered agent for service of process is CT Corporation System, 330 North Brand Blvd., Suite 700, Glendale, California 91203.  Defendant states it offers its proprietary system to individual customers to place order via online properties and mobile applications for products provided by merchants such as Plaintiff.  DoorDash is the most popular food delivery service in the country, having a 65% of the market share along with its subsidiaries.

9.      The Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(a), 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members of the Class and there is minimum diversity of citizenship between the Parties.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because (i) Defendant maintains its principal place of business in this district and (ii) the Parties agreed to the exclusive jurisdiction in the courts of San Francisco County, California, or the Northern District of California in a December 17, 2019 "DoorDash Demand Generation Agreement."  Attached as **Exhibit A**.

**FACTUAL ALLEGATIONS**

A.      <u>**Background of New York City's Restaurant Industry**</u>

11.     New York City (which includes the five Boroughs Queens, Bronx, Brooklyn, Manhattan, and Staten Island) (hereafter, "NYC") is a mecca for acclaimed and diverse food options. With more than 23,000 establishments (as of 2019), NYC's eateries represent food influenced by 150 different countries.[2] If a person attempted to eat, just once, at every restaurant in New York City, it would take over twenty years to visit them all.[3]

---

[2] Thomas P. DiNapoli "The restaurant industry in New York City: Tracking the recovery," *Office of the New York State Comptroller*, September 2020, https://www.osc.state.ny.us/files/reports/osdc/pdf/nyc-restaurant-industry-final.pdf, p. 1.

[3] Nick Hines "It would take 22.7 Years to eat at every New York City restaurant," *Vinepair*, May 9, 2017, https://vinepair.com/booze-news/new-york-restaurants-eat-at-every-on/.



**CLASS ACTION COMPLAINT**

12.     Just like the food they offer, NYC's food and restaurant industry is not monolithic, but rather comprised of everything from small mom-and-pop establishments to street vendors, to Michelin-starred, fine dining restaurants. Eighty percent of NYC's restaurants are "small," with fewer than 20 employees, while only one percent have more than 500 workers.[4] With such a diverse food landscape within such a small geographic area, it is no wonder that New York City is consistently ranked as one of the culinary capitals of the world, and that New York City's eateries form the second-largest component of NYC's tourism industry, after accommodations.[5]

13.     In addition to being a key contributor to NYC's economy, the restaurant industry is a vital source of employment. Prior to the COVID-19 pandemic, there were more than 23,600 food establishments which contributed to nearly $27 billion in taxable sales.[6] In 2019, the industry accounted for one in every 12 private sector positions, supporting around 317,800 jobs.[7] Clearly, the food and restaurant sector is a pivotal economic contributor and an essential component of NYC's identity, to New Yorkers and visitors alike.

**B.      History of Food Delivery**

14.     According to a 2016 Business Insider article, the food delivery marketplace was a "massive unfulfilled market opportunity…which will incentivize continued competition and, potentially, an influx of new entrants."[8] In 2016, seven percent of sales at U.S. restaurants occurred through food delivery.[9] Seeing the potential for profit in this industry, venture capital firms invested huge sums of money in food delivery companies. Over $1 billion was invested in 2014 in food and grocery delivery, and a further half a billion dollars was invested in Q1 of 2015 in this sector.[10] DoorDash reportedly raised nearly $2.5 billion in venture capital funding before its

---

[4] DiNapoli, "The restaurant industry in New York City: Tracking the recovery," September 2020, p.1.

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] Martin Mignot, "The Billion Dollar Food Delivery Wars" July 11, 2015,

**CLASS ACTION COMPLAINT**



initial public offering.[11]

15.    The industry has only grown with time.  In North America alone, the online food delivery market reached $29.8 billion in 2022.[12]  This number is expected to grow to $64.8 billion by 2028.[13]  Globally, this market reached $126.91 billion in 2021 and is expected to grow to $192.16 billion by 2025.[14]  Moreover, the number of users has grown dramatically from 36.4 million in the U.S. in 2019 to 53.9 million in 2023.[15]

16.    The influx of venture capital money into food delivery companies helped these companies grow and attract new customers. A 2017 Morgan Stanley report predicted that by 2020, 40 percent of total restaurant sales could occur through online delivery.[16] Online restaurant orders grew 23 percent annually from 2013 to 2017.[17] In 2018, UBS predicted that by 2030 the global online food-ordering marketplace could grow to $365 billion, up from $35 billion in 2018.[18] A 2019 survey conducted by the National Restaurant Association found that 60 percent of consumers ordering takeout used a third-party delivery service.[19]  A 2021 survey by Statista Global Consumer Survey found 37% of food orders from restaurants used food delivery services.[20]

---

https://techcrunch.com/2015/07/11/the-billion-dollar-food-delivery-wars/

[11] Danny Crichton, "The VC and founder winners of DoorDash's IPO" TechCrunch, November 13, 2020, https://techcrunch.com/2020/11/13/the-vc-and-founder-winners-of-doordashs-ipo/

[12] North America Online Food Delivery Market: Industry Trends, Share, Size, Growth, Opportunity and Forecast 2023-2028, IMARC Group (Sept. 2023)

[13] *Id.*

[14] https://www.appmysite.com/blog/online-food-ordering-statistics/

[15] *Id.*

[16] "Alexa, What's for Dinner Tonight?" Morgan Stanley, June 26, 2017, https://www.morganstanley.com/ideas/online-food-delivery-market-expands

[17] The NPD Group "Feeding the growing appetite for restaurant apps, https://www.npd.com/wps/portal/npd/us/news/infographics/2018/feeding-the-growing-appetite-for-restaurant-apps/.

[18] USB Investment Bank "Is The Kitchen Dead?" June 18, 2018, https://www.ubs.com/global/en/investment-bank/in-focus/2018/dead-kitchen.html

[19] Hudson Riehle and Melissa Wilson "Harnessing Technology to Drive Off-Premises Sales," 2019, *National Restaurant Association*, https://www.restaurant.org/Downloads/PDFs/Research/research_offpremises_201910.

[20] https://www.appmysite.com/blog/online-food-ordering-statistics/


ROSSI
DOMINGUE
LLP

**CLASS ACTION COMPLAINT**

1       17.    Within the food delivery marketplace, companies have adopted different business

models that aim to either help restaurants increase their sales, or process and make deliveries.

Some as a software and marketing services that aggregate restaurants and create listings from

which consumers can place orders. Typically, restaurants partnering with these manage their own

fleet of couriers.[21] These software-based businesses market to restaurants by arguing they generate

incremental orders, therefore increasing a restaurant's profitability,[22] and by replacing a

restaurant's antiquated phone-ordering system with a more efficient web and mobile platform that

is integrated with their kitchen workflow.[23]

       18.    DoorDash offers marketing and software options, but also manages the delivery of

the food from the restaurant to the customer. Through hiring independent contractors, DoorDash

maintains a fleet of couriers typically paid a per-trip payment to deliver the food. In addition to

offering software and marketing services, DoorDash handles the logistics of delivering the food,

which includes the hiring and paying of couriers and shift planning.[24] DoorDash, like other

delivery services, offers to solve the "last-mile" problem for many (but not all locations), the last

mile of transportation of a product being the most complicated and costliest part of getting a

product to a consumer.[25]

       19.    NYC is no exception to the food delivery phenomenon.  Overall, food delivery is a

popular way for New Yorkers to dine. According to a 2017 Department of Transportation report,

55 percent of New Yorkers ordered take out a few times per month.[26] City residents spend around

---

[21] Martin Mignot, "The Billion Dollar Food Delivery Wars" July 11, 2015, https://techcrunch.com/2015/07/11/the-billion-dollar-food-delivery-wars/; and Conversations between Council Staff and Grubhub

[22] Pnina Feldman, Andrew E. Frazelle, and Robert Swinney, "Managing Relationships Between Restaurants and Food Delivery Platforms: Conflict, Contracts, and Coordination," July 30, 2021, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3258739

[23] Martin Mignot, "The Billion Dollar Food Delivery Wars" July 11, 2015, https://techcrunch.com/2015/07/11/the-billion-dollar-food-delivery-wars/

[24] *Id.*

[25] Do J. Lee, 'Delivering Justice: Food Delivery Cyclists in New York City" Dissertation submitted to the Graduate Faculty in Psychology, City University of New York, September 2018, https://academicworks.cuny.edu/cgi/viewcontent.cgi?article=3854&context=gc_etds

[26] "CITYWIDE MOBILITY SURVEY," DEPARTMENT OF TRANSPORTATION, August

**CLASS ACTION COMPLAINT**

ROSSI DOMINGUE LLP

$773.70 per year on food delivery, which is more money than residents of any other U.S. city.[27] The frequency with which New Yorkers order takeout is a consequence of the culture and cityscape of New York. As previously mentioned, there are over 23,000 eateries in NYC, the most of any city in the country.[28] The comparatively small percentage of New Yorkers that own cars in comparison to other American cities may also be a cause of City residents' high use of delivery services in NYC. According to the 2019 U.S. Census, in the tristate area,[29] 31 percent of households do not own a car.[30] The NYC Economic Development Corporation estimates that 55 percent of households in NYC do not own a car.[31] Other major cities have much higher rates of car ownership: only 12 percent of households do not own cars in San Francisco, 12.5 percent in Chicago, 7.6% in Los Angeles.[32]

**C.**    **The Impact of the Pandemic**

20.     During the COVID-19 pandemic, when lockdowns were in place across the country, many consumers turned to take-out due to restricted dine-in options. Over 65 percent of consumers in the United States are more likely to purchase takeout from a restaurant now than before the pandemic, and over 50 percent of consumers say that takeout and delivery are essential

---

2017,  http://www.nyc.gov/html/dot/downloads/pdf/nycdot-citywide-mobility-survey-report-2017.pdf

[27] RACHEL CHIU, "Send back the bad food delivery bill" Daily News, August 11, 2021, https://www.nydailynews.com/opinion/ny-oped-send-back-the-bad-food-delivery-bill-20210811-ubucnk4hpfac7gr64v4d3rlqzy-story.html

[28] Darcy Schild, "The 25 best US cities for foodies," Insider, October 7, 2019, https://www.insider.com/best-cities-in-the-us-for-foodies-2019-10

[29] The Census includes NYC with Newark and Jersey City

[30] Bailey Peterson, "Car Ownership Statistics (2021 Report)" ValuePenguin, https://www.valuepenguin.com/auto-insurance/car-ownership-statistics

[31] NYCEDC, "New Yorkers and Their Cars," April 5, 2018,  https://edc.nyc/article/new-yorkers-and-their-cars

[32] Bailey Peterson, "Car Ownership Statistics (2021 Report)" Value Penguin, https://www.valuepenguin.com/auto-insurance/car-ownership-statistics


ROSSI
DOMINGUE
LLP

1  to the way they now live.[33] According to analysts from Morgan Stanley, the increase in use of

2  food delivery that was projected to take years occurred in a few months.[34]

3        21.      Third-party platforms profited from the surge in consumer use of their platforms

4  during the pandemic. The major food delivery platforms doubled their combined revenue during

5  the pandemic, making a profit of $5.5 billion in April to September 2020, compared to $2.5 billion

6  during the same months the previous year.[35] Food delivery companies generated $50.6 billion in

7  sales in 2020, more than double the $22.7 billion in sales generated in 2019.[36] A study found that

8  of the $28 billion increase in sales that occurred between 2019 and 2020, over $19 billion (69

9  percent) of this increase was due to the pandemic.[37] The report concludes, "Sales would have

10 grown by 38% in the absence of the pandemic, significantly less than the 122% [growth] that was

11 actually observed."[38]

12       22.      The increase in consumer usage of third-party food delivery platforms during the

13 pandemic was also caused by an increase in restaurants joining delivery platforms. Because

14 restaurants across the country were only open for take-out and delivery, many restaurants not

15 previously on delivery platforms joined the platforms for the first time. The de Blasio

16 administration issued a COVID-19 related guidance sheet for business owners on March 16, 2020,

17 advising restaurants and food services to join food delivery platforms.[39] Accordingly, the

---

[33] "National Restaurant Association Releases 2021 State of the Restaurant Industry Report," January 26, 2021,  https://restaurant.org/news/pressroom/press-releases/2021-state-of-the-restaurant-industry-report

[34] "COVID-19 Era Serves Up Big Changes for U.S. Restaurants," Morgan Stanley, https://www.morganstanley.com/ideas/coronavirus-restaurant-trends

[35] Levi Sumagaysay "The pandemic has more than doubled food-delivery apps' business. Now what?" *MarketWatch*, November 27, 2020, https://www.marketwatch.com/story/the-pandemic-has-more-than-doubled-americans-use-of-food-delivery-apps-but-that-doesnt-mean-the-companies-are-making-money-11606340169.

[36] Elliot Shin Oblander and Daniel Minh McCarthy, "How has COVID-19 Impacted Customer Relationship Dynamics at Restaurant Food Delivery Businesses?" April 26, 2021, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3836262

[37] *Id.*

[38] *Id.*

[39] Flatiron District "Guidance for business owners – Updated March 16, 2020: Tips for addressing changes in customer behavior due to the Novel (New) Coronavirus (COVID19),"

**CLASS ACTION COMPLAINT**



platforms were able to expand their footprint in NYC by increasing the number of restaurants on their platforms. During an interview with MarketWatch, Grubhub CEO Matt Maloney acknowledged that the pandemic caused the platform to receive "10 to 15 times our usual new restaurant leads. This interest has led to four to five times newer restaurant go-lives compared to our previous record-breaking day."[40] Maloney meanwhile acknowledged that restaurants could not survive on deliveries alone during the pandemic.[41] According to Maloney, "The industry isn't large enough for all restaurants to survive just on delivery, but they can survive for a matter of weeks potentially. It's definitely not a long-term solution to bridge across restaurants."[42]

23.    The financial success of these companies is also apparent from their corporate strategies during this period. Uber acquired the delivery service Postmates in November 2020, further consolidating the food delivery marketplace.[43] In December 2020, DoorDash made its public market debut and the DoorDash stock rose 86 percent during its initial public offering (IPO), one of the biggest IPOs of 2020.[44]

**D.    New York City Takes Action to Protect Restaurants**

24.    On January 21, 2020, the first U.S. case of the COVID-19 virus was confirmed by the Center of Disease Control and Prevention.[45]

---

https://www.flatirondistrict.nyc/uploaded/files/COVID-19/COVID-19%20Guidance%20for%20Business%20Owners%20-%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.pdf

[40] *Id.*

[41] Elisabeth Buchwald, "Restaurants can't survive on delivery alone, says Grubhub CEO Matt Maloney," March 23,2020, MarketWatch, https://www.marketwatch.com/story/restaurants-wont-be-able-to-survive-ondelivery-only-says-grubhub-ceo-matt-maloney-2020-03-21

[42] *Id.*

[43] "Mike Isaac, Erin Griffith and Adam Satariano, "Uber Buys Postmates for $2.65 Billion," *The New York Times*, Updated November 13, 2020, https://www.nytimes.com/2020/07/05/technology/uber-postmates-deal.html#:~:text=SAN%20FRANCISCO%20%E2%80%94%20Uber%20has%20agreed,stock%20deal%20on%20Monday%20morning

[44] Erin Griffith, "DoorDash Soars in First Day of Trading," *The New York Times*, Updated March 19, 2021,  https://www.nytimes.com/2020/12/09/technology/doordash-ipo-stock.html

[45] https://www.cdc.gov/media/releases/2020/p0121-novel-coronavirus-travel-case.html


ROSSI
DOMINGUE
LLP

25.     On January 30, 2020, the World Health Organization declared the COVID-19 virus a "public health emergency of international concern."[46]

26.     On March 7, 2020, New York Governor Cuomo issued Executive Order Number 202 declaring a state of emergency for the entire State of New York.[47] On March 16, 2020, Governor Cuomo issued Executive Order Number 202.3 prohibiting restaurants and bars in the State of New York from serving food or beverages on- premises due to the spread of COVID-19.[48]

27.     On March 22, 2020, Governor Cuomo's executive order "New York State on PAUSE" required all non-essential businesses to close in-office personnel functions to help stop the infection rate of the COVID-19 virus.[49]

28.     On May 13, 2020, the New York City Council passed emergency legislation placing a cap on the delivery fees that third-party delivery companies, such as Defendant, could charge restaurants for their services.

29.     Effective June 2, 2020, the Delivery App. Legislation prohibited third-party food delivery services from charging restaurants a fee of more than fifteen percent (15%) of the purchase price of each order, exclusive of taxes, for providing delivery services, and a fee of more than five percent (5%) per order for all other types of charges.

30.     DoorDash has violated these limits since they were first instituted by New York.

**E.     <u>Plaintiff Harlem Shake</u>**

31.     Plaintiff operates a restaurant in NYC. Beginning in 2019, DoorDash entered into an agreement to provide delivery service providers to Plaintiff.

---

[46] https://www.cnn.com/2020/01/30/health/coronavirus-who-public-health-emergency-international-concern-declaration/index.html

[47] https://www.governor.ny.gov/news/no-202-declaring-disaster-emergency-state-new-york

[48] https://www.governor.ny.gov/news/no-2023-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency

[49] https://www.governor.ny.gov/news/governor-cuomo-issues-guidance-essential-services-under-new-york-state-pause-executive-order


ROSSI
DOMINGUE
LLP

32.     DoorDash charges fees for participation in DoorDash's delivery service program. Plaintiff's agreement with DoorDash is attached as **Exhibit A.**

33.     Plaintiff utilized DoorDash's delivery service program beginning in 2019 and continues to be a subscriber.

34.     In or around June 2023, Plaintiff's staff detected charges in DoorDash's reports of its charges that exceeded the fee cap established by the Delivery App. Legislation.

35.     DoorDash received a demand to explain the excessive fees, which DoorDash admitted had been charged. On June 28, 2023 a representative of DoorDash provided Plaintiff with the following information, stating that DoorDash had improperly taken $13,932.01 in commissions:

| Business Id | Store Id | Store Name | Business Line | Subtotal | Commission Rate | Commission Cha | Correct Commiss | Correct Commiss | Extra Commissio | Amount Owed To Mx ($) |
|---|---|---|---|---|---|---|---|---|---|---|
| 48490 | 177273 | Harlem Shake (V | Classic - CAV | 9420.5 | 10 | $942.84 | 5 | $471.03 | 5 | $471.82 |
| 48490 | 177273 | Harlem Shake (V | DoorDash for Bu | 2628 | 10 | $261.02 | 5 | $131.40 | 5 | $129.62 |
| 48490 | 177273 | Harlem Shake (V | Marketplace - Cla | 134321.71 | 10 | $13,382.44 | 5 | $6,716.09 | 5 | $6,666.35 |
| 48490 | 177273 | Harlem Shake (V | Marketplace - Pic | 59.46 | 10 | $5.96 | 5 | $2.97 | 5 | $2.99 |
| 48490 | 177273 | Harlem Shake (V | Marketplace - Su | 125631.96 | 10 | $12,522.62 | 5 | $6,281.60 | 5 | $6,241.02 |
| 48490 | 177273 | Harlem Shake (V | Subscription - CA | 8389 | 10 | $839.66 | 5 | $419.45 | 5 | $420.21 |
| | | | | | | | | | | $13,932.01 |

36.     At the same time, DoorDash insisted that Harlem Shake execute a release and settlement of any and all claims related to DoorDash's "miscalculated fees" for the period of "November 1, 2019 to May 12, 2023," for the sum of $7,259.19.

37.     DoorDash thereafter provided a partial accounting of the charges DoorDash had made on Plaintiff's DoorDash account. To date, DoorDash has failed to provide any full accounting, but has admitted that it charged fees in excess of the fee cap.

38.     Based on the investigation of counsel and on information and belief, DoorDash has charged fees to the Class that are in excess of the fee cap, and this practice is widespread and pervasive.

## CLASS ACTION ALLEGATIONS

39.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following "Class":

> All food service establishments located within the five New York
> City boroughs that contracted with Defendant for delivery services



11

**CLASS ACTION COMPLAINT**

1    were charged more for such delivery services than allowed under
Administrative Code of NYC of New York, § 20-563.3.

2    40.    The following are expressly excluded from the Class: (1) Defendant and its

3    subsidiaries and affiliates; (2) all food service establishments who make a timely election to be

4    excluded from the proposed Class; (3) governmental entities; (4) the Court to which this case is

5    assigned and its staff; and (5) all food service establishments that have a contract with DoorDash

6    that contains an arbitration provision banning class actions.

7    41.    This action can be maintained as a class action because there is a well-defined

8    community of interest in the litigation, and the proposed Class is easily ascertainable.

9    42.    It is estimated that the Class numbers in the thousands and joinder of all Class

10    members is impracticable.

11    43.    This action involves common questions of law and fact applicable to each Class

12    member that predominate over questions that affect only individual Class members.  Thus, proof

13    of a common set of facts will establish the right of each Class member to recover.  Questions of

14    law and fact common to each Class member include:

15    a.    Whether Defendant charged Plaintiffs fees in excess of the fee cap
of 15% for total orders and/or fees in excess of the 5% cap for other
16    charges.

17    b.    Whether Plaintiff and the Class are entitled to equitable and/or
injunctive relief; and
18

19    c.    Whether Defendant's unlawful, unfair, and/or deceptive practices
harmed Plaintiff and the Class.

20    d.    The amount of overcharged fees due and payable to Plaintiff and
the Class to compensate them.
21

22    44.    Plaintiff's claims are typical of the claims of the Class because Plaintiff bought the

23    Products during the Class Period.  Defendant's unlawful, unfair, and/or fraudulent actions concern

24    the same business practice described herein irrespective of where they occurred or were

25    experienced.  Plaintiff and the Class sustained similar injuries arising out of Defendant's conduct

26    in violation of New York law.  The injuries of each member of the Class were caused directly by

27    Defendant's wrongful conduct.  In addition, the factual underpinning of Defendant's misconduct

28



12
**CLASS ACTION COMPLAINT**

is common to all Class members and represents a common thread of misconduct resulting in injury to all members of the Class. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the Class members and are based on the same legal theories.

45.     Plaintiff will fairly and adequately protect the interests of the Class. Neither Plaintiff nor Plaintiff's counsel have any interests that conflict with or are antagonistic to the interests of the Class members. Plaintiff has retained highly competent and experienced class action attorneys to represent her interests and those of the members of the Class. Plaintiff and Plaintiff's counsel have the necessary financial resources to litigate this class action adequately and vigorously, and Plaintiff and counsel are aware of their fiduciary responsibilities to the Class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class.

46.     There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Further, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Class treatment of common questions of law and fact would also be superior to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the Court and the litigants and will promote consistency and efficiency of adjudication.

47.     The prerequisites to maintaining a class action for injunctive or equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

48.     The prerequisites to maintaining a class are met as questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

49.     Plaintiff and Plaintiff's counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### COUNT I

**Violation of Administrative Code of Nyc of New York, § 20-563.3,**

**New York Local Law No. 52 Of 2020, and**

**New York Local Law No. 88 of 2020**

50.     Plaintiff incorporates by reference each allegation set forth above.

51.     Plaintiff, and the other Class members, are food service establishments as used in Local Law No. 52 of 2020, Local Law No. 88 of 2020, and Administrative Code of NYC of New York.

52.     Plaintiff, and the other Class members, contracted with Defendant for "third-party delivery service(s)" as defined by these New York laws.

53.     Upon information and belief, during all relevant times, Defendant violated Local Law No. 52 of 2020, Local Law No. 88 of 2020, and Administrative Code of NYC of New York by charging Plaintiff, and the other Class members, in excess of the mandated fifteen percent (15%) and five percent (5%) fee caps specified by the legislations.

54.     As a result of Defendant's actions, Plaintiff and the other Class members have suffered damages in the form of overcharges and lost profits in an amount to be determined at trial.



**CLASS ACTION COMPLAINT**

<b>COUNT II</b>

<b>Violation of the New York General Business Law § 349</b>

55.    Plaintiff incorporates by reference each allegation set forth above.

56.    Defendant has violated New York consumer protection statute in that Defendant has engaged in acts or practices that are deceptive or misleading in a material way and Plaintiff and the Class have been injured by reason thereof.

57.    These deceptive acts are misleading to "a reasonable consumer."  Plaintiff and the Class are reasonable consumers in that they are persons/entities that this New York statute is designed to protect.

<b>COUNT III</b>

<b>Unjust Enrichment</b>

57.    Plaintiff incorporates by reference each allegation set forth above.

58.    As a result of Defendant's fraudulent and misleading actions described herein, Defendant has been enriched at the expense of Plaintiff and the Class.

59.    It would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits it received from Plaintiff and the Class in light of the fact that Defendant did not abide by New York law.  Thus, it would be unjust and inequitable for Defendant to retain any monies over and above what was permitted under New York law.

60.    As a direct and proximate result of Defendant's actions, Plaintiff and the Class have suffered damages in an amount to be proven at trial.

<b>JURY DEMAND</b>

Plaintiff hereby demands a trial by jury of her claims.

<b>PRAYER FOR RELIEF</b>

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for judgment against Defendant as follows:

A.    For an order certifying this case as a class action and appointing Plaintiff and its counsel to represent the Class;



<b>CLASS ACTION COMPLAINT</b>

1             B.     For an order awarding as appropriate, damages, restitution, and/or

2    disgorgement to Plaintiff and the Class;

3             C.     For an order requiring Defendant to immediately cease and desist from the

4    conduct complained of herein, and ordering Defendant to engage in corrective action;

5             D.     For an order awarding attorneys' fees and costs;

6             E.     For an order awarding pre-and post-judgment interest; and

7             H.     For an order providing such further relief as this Court deems proper.

8    Dated:  February 16, 2024

                          Respectfully submitted,

                          /s/ Jenelle Welling

                         Jenelle Welling
                         ROSSI DOMINGUE, LLP
                         3201 Danville Blvd.
                         Suite 172
                         Alamo, CA 94507
                         (408) 495-3900
                         jenelle@rdlaw.net

                         Charles Barrett
                         Daniella Bhadare-Valente
                         NEAL & HARWELL, PLC
                         1201 Demonbreun St.
                         Suite 1000
                         Nashville, TN 37203
                         (615) 244-1713
                         cbarrett@nealharwell.com
                         dbhadare-valente@nealharwell.com

                         David McMullan
                         BARRETT LAW GROUP, P.A.
                         P.O. Box 927
                         404 Court Square North
                         Lexington, MS 39095
                         (662) 834-2488
                         dmcmullan@barrettlawgroup.com

                         *Counsel for Plaintiff and the Class*



# EXHIBIT A

# Electronic Record of Contracts

This document was generated as a record of certain contracts created, accepted and stored electronically.

 **DOORDASH**

## Summary of Contracts

This document contains the following contracts.

| Title | Revision | ID |
|-------|----------|-----|
| DD Demand Generation MSA | 1 | 5df80521ea48103c6c16b21b |

## Contract signed by:

| | | |
|---|---|---|
| **Emil Radoncic** | Signer ID: | eradoncic@harlemshakenyc.com |
| Owner, | Email: | eradoncic@harlemshakenyc.com |
| Harlem Shake (W 124th St) | Mobile #: | +19175879290 |

| | |
|---|---|
| Date / Time: | Dec 17, 2019 at 8:03 PM GMT |
| IP Address: | 108.21.89.81 |
| User Agent: | Mozilla/5.0 (Windows NT 6.1; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/79.0.3945.79 Safari/537.36 |

| | | |
|---|---|---|
| **Eric Reynolds** | Signer ID: | eric.reynolds@doordash.com |
| Sales Lab Executive | Email: | eric.reynolds@doordash.com |
| | Mobile #: | +16232338322 |

| | |
|---|---|
| Date / Time: | Dec 17, 2019 at 8:37 PM GMT |
| IP Address: | 70.190.95.231 |
| User Agent: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/78.0.3904.108 Safari/537.36 |

Completed by all parties on:
**Dec 17, 2019 at 8:37 PM GMT**

☑ **DOORDASH DEMAND GENERATION MERCHANT SERVICES AGREEMENT**

THIS DOORDASH DEMAND GENERATION AGREEMENT (the "Agreement") is effective as of the Effective Date, between Merchant and DoorDash. By signature below, the duly authorized representatives of the parties agree to the terms and conditions of this Agreement as of the Effective Date.

| | |
|---|---|
| DoorDash, Inc. ("DoorDash") <br> State of Incorporation: Delaware <br> Type of Entity: Corporation | Omnity Consulting LLC ("Merchant") <br> State of Incorporation: NY <br> Type of Entity: LLC |
| Signature: <br> *Eric Reynolds* <br> ✉ eric.reynolds@doordash.com | Signature: <br> *Emil Radoncic* <br> eradoncic@harlemshakenyc.com |
| Name: Eric Reynolds | Name: Emil Radoncic |
| Title: Sales Lab Executive | Title: managing member |
| Date: Dec 17, 2019 | Date: Dec 17, 2019 |
| Address: <br> DoorDash, Inc. <br> 901 Market St, Suite 600 <br> San Francisco, CA 94103 <br> Legal notices: legal@doordash.com | Address: <br> Omnity Consulting LLC <br> 100 W 124th St <br> New York, NY 10027 |
| Contact Name: Emil Radoncic <br> Contact Email: eradoncic@harlemshakenyc.com | Contact Name: Emil Radoncic <br> Contact Email: eradoncic@harlemshakenyc.com |
| Effective Date: Dec 17, 2019 | |
| Number of Locations: 1 | |
| Section 9 Payment Processing Information (REQUIRED) <br> Stripe Connected Account Representative Name: Emil Radoncic <br> Stripe Connected Account Representative Date of Birth (MM/DD/YYYY): 04/22/1979 <br> Employer ID Number (EIN): 264617375 | |

**Demand Gen Delivery Fee: $1.99**
**Demand Gen Promotion Fee:** 10%
**Delivery Radius (Miles):** 1 mile
**Custom Delivery Radius Attachment:**

**Agrees to PickUp:** ☑
**PickUp Commission Rate: 10%**
_**Info for Weekly Payments and Order Placement**_. DoorDash will provide weekly payment using the information you provide above and in the DoorDash Sign-Up Sheet Appendix, if applicable. Orders will be transmitted to you as follows (select order protocol and provide information as needed):

| | | | |
|---|---|---|---|
| Order Protocol: | Tablet (DoorDash Owns) | Weekly Tablet Subscription Fee: | $0 |
| Order Protocol Email: | | Weekly Printer Subscription Fee: | |
| Order Protocol Fax: | | | |

**Interested in photoshoot?**
**No**
_**Request a FREE photoshoot of your dishes.**_ **Customers are more likely to order from stores with photos!** Please list contact information for the store representative that our photographer can directly contract to schedule the photoshoot. You grant DoorDash a license to use and display photos taken during the shoot.

| Contact Name: | Contact Email: | Contact Phone: |
|---|---|---|

**Please give a preferred date and time for your photoshoot that is 7-16 days in the future. We cannot accommodate photoshoot requests less than 7 days in the future.**

| Preferred Date: | Preferred Time: |
|---|---|

_Menu Source:_

| | | | |
|---|---|---|---|
| Menu URL: | https://www.grubhub.com/restaurant/harlem-shake-100-w-124th-st-new-york/289109 | or Menu Attachment: | |
| Secondary URL: | https://www.grubhub.com/restaurant/harlem-shake-100-w-124th-st-new-york/289109 | or Secondary Attachment: | |
| Tertiary URL: | | or Tertiary Attachment: | |

Page 1

_The remainder of this page is intentionally left blank._

1. **RECITALS.** DoorDash and Merchant desire to promote and market, via the DoorDash Platform (all terms defined below), participating Merchant Store(s) and operated by Merchant or, if Merchant is a franchised operation, Merchant's Eligible Franchisees, in exchange for a Promotion Fee and in accordance with this Agreement (the "**Program**"). DoorDash offers a proprietary system (the "**DoorDash Marketplace**") which allows DoorDash customers ("**End Customers**") to place orders via online properties and mobile applications for products provided by merchants ("**Merchant Products**"), which may be delivered by the Merchant to the End Customer. DoorDash is not a merchant, food preparation business, reseller, or delivery service; it is an online connection platform.

2. **TYPES OF MERCHANTS.** Depending on Merchant's ownership model, the following terms apply.

a. Franchise Only Model. If Merchant does not operate any stores licensed under Merchant's brand and all such stores are owned and operated by Merchant's franchisees, then references to Merchant in Sections 4(b), 6, 12, 13, 14 will apply to Eligible Franchisees only, provided that such Franchisees sign the Supplemental Agreement attached as Exhibit A. Merchant will not be liable for the acts or omissions of Eligible Franchisees.

b. Corporate Owned Model. If Merchant is not a franchisor, then any references to franchisees are deemed inapplicable to Merchant, and Section 4(c) and Exhibit B do not apply. Except for the foregoing terms, this Agreement applies to all Merchant owned stores, unless excluded by Merchant in an attached exhibit.

c. Both Franchise and Corporate Owned Model. If Merchant is a franchisor and Merchant owns or operates stores licensed under Merchant's brand, then all the terms and exhibits in this Agreement will apply. This Agreement applies to all Merchant owned or operated stores, unless excluded by Merchant in an attached exhibit.

3. **PROMOTIONAL DEALS.** Merchant and DoorDash acknowledge and agree that DoorDash may, in the course of this Agreement, offer the Merchant marketing or promotional programs, including programs that modify Merchant's Promotion Fee. Merchant and DoorDash agree that, if Merchant chooses to accept or participate in any such programs, separate written and signed documentation of a formal amendment to this Agreement would be commercially impracticable, so the programs need not be memorialized in a separate written amendment to this Agreement to be enforceable and binding on the parties, and the parties' performance of such programs shall legally bind the parties to the terms performed. Except as agreed and performed in any such programs, the provisions of this Agreement shall remain fully binding and effective between Merchant and DoorDash.

4. **DEMAND GENERATION OBLIGATIONS.**

a. DoorDash. During the Term, DoorDash will: (i) display Merchant's name, logo, and/or photographs, a listing of the Merchant Stores, and a menu of the Merchant Products, in the standard format supported by the DoorDash System, (ii) accept orders for Merchant Products through the DoorDash Marketplace from End Customers ("Orders"). If DoorDash determines, in its reasonable discretion that continuing to support Orders with respect to a particular Merchant Product or Merchant Store would subject DoorDash to undue regulatory risk or other liability, then DoorDash may remove such Merchant Product and/or Merchant Store from the DoorDash Marketplace.

b. Merchant. During the Term, Merchant will: (i) accept all End Customer Orders placed by DoorDash that are in general compliance with Merchant's standard operating procedures and operating hours; (ii) use its standard business practices to prepare the Merchant Products that are the subject of each Customer Order at the applicable Merchant Store and deliver the Merchant Products to the End Customer within or as close to within the quoted delivery time as reasonable based on its standard business practices; (iii) promptly notify DoorDash of any generally applicable changes to the pricing, availability, description, or other characteristics of the Merchant Products, and (iv) promptly disclose common allergens on Merchant's menu.

c. Eligible Franchisees. Eligible Franchisees operating a branded restaurant or store concept owned by Merchant may participate in the Program pursuant to the terms and conditions of this Agreement provided that the individual franchisee enters into an agreement in substantially the same form as the Supplemental Agreement attached hereto as Exhibit A.

5. **CONFIDENTIAL INFORMATION.**

a. Exclusions. Confidential Information does not include information that: (i) was rightfully known to the Recipient without restriction on use or disclosure prior to such information's being disclosed to the Recipient in connection with this Agreement; (ii) was or becomes

public domain other than by the fault of the Recipient; (iii) was or is received by the Recipient on a non-confidential basis from a third party that, to the Recipient's knowledge, was not at the time under any obligation to maintain its confidentiality; or (iv) the Recipient can demonstrate by documentary records was independently developed by the Recipient without access to, use of or reference to any Confidential Information.

b. Obligations. The Recipient shall: (i) not access or use Confidential Information other than as necessary to exercise its rights or perform its obligations in accordance with this Agreement; (ii) except subject to its compliance with Section 5(c), not disclose or permit access to Confidential Information other than to its Representatives who need to know such Confidential Information for purposes of the Recipient's exercise of its rights or performance of its obligations under and in accordance with this Agreement, and prior to any such disclosure are bound by written confidentiality and restricted use obligations at least as protective of the Confidential Information as the terms set forth in this Section; and (iii) safeguard the Confidential Information from unauthorized use, access or disclosure using at least the degree of care it uses to protect its most/similarly sensitive information and in no event less than a reasonable degree of care.

c. Compelled Disclosures. If the Recipient is compelled by applicable law to disclose any Confidential Information then, to the extent permitted by applicable law, the Recipient shall promptly notify the Discloser in writing of such requirement so that the Discloser can seek a protective order or other remedy or waive its rights under Section 5(c) and provide reasonable assistance to the Discloser, at the Discloser's sole expense, in opposing or seeking protective limitations on disclosure.

6. **SUPPORT & REFUNDS.** DoorDash shall be responsible for customer support issues relating to the ordering of Merchant Products and issues relating to an End Customer's DoorDash account. All other customer issues will be Merchant's responsibility. In the event that DoorDash, in its sole discretion, has to issue a refund or re-order for an End Customer's Order, Merchant will prepare the food to the same specifications as the original Order (in the case of a re-order) and bear the full cost of that refund or re-order, unless the problem with the original Order was due to a technical issue of the DoorDash Marketplace.

7. **REPRESENTATIONS AND WARRANTIES; DISCLAIMER.**

a. Each party represents and warrants that it has the full right, power, and authority to enter into and perform its obligations under this Agreement without breaching any obligation to any third party.

b. Merchant represents and warrants that it will comply with all applicable laws and regulations in its performance of this Agreement, including without limitation (i) all applicable data protection and privacy laws; (ii) all applicable laws, rules, standards and regulations relating to licenses, health, food safety and sanitation, food labeling, and (iii) all applicable laws related to third party intellectual property and other proprietary rights.

c. EXCEPT AS EXPRESSLY SET FORTH HEREIN, TO THE EXTENT PERMITTED BY APPLICABLE LAW, DOORDASH HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, REGARDING THE DOORDASH PLATFORM, EQUIPMENT OR SERVICES, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTIES OF MERCHANTABILITY, TITLE, SATISFACTORY QUALITY OR RESULTS, OR FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT. Merchant acknowledges that the operation of the Platform may from time to time encounter technical or other problems and may not necessarily continue uninterrupted or without technical or other errors and DoorDash shall not be responsible to Merchant or others for any such interruptions, errors, or problems or an outright discontinuance of the Platform nor for any guarantee of results with respect to the DoorDash services contemplated herein. Both Parties acknowledge that neither party has any expectation or has received any assurances for future business or that any investment by a party will be recovered or recouped or that such party will obtain any anticipated amount of profits by virtue of this Agreement.

8. **INDEMNIFICATION.** The Indemnifying Party will defend, indemnify, and hold harmless the Indemnified Party from and against Losses with respect to any third-party claims alleging, arising out of or related to: (i) bodily injury (including death) or damage to tangible or real property to the extent caused or alleged to be caused by the Indemnifying Party (in the case of Merchant, Merchant Products); (ii) any claims that the Indemnifying Party breached its representations or warranties in this Agreement; (iii) the violation of the intellectual property in the Indemnifying Party's Materials. In addition, Merchant will defend, indemnify and hold harmless DoorDash from any and all Losses related to any violation or alleged violation of any applicable retail food or other health and safety code, rule, or regulation related to Merchant Product(s) and any co-employment or misclassification claims filed by delivery couriers against

DoorDash. In each case the Indemnifying Party shall provide the Indemnifying Party with (a) prompt notice of any claims such that the Indemnifying Party is not prejudiced by any delay of such notification; (b) the option to assume sole control over defense and settlement of any claim; and (c) reasonable assistance in connection with such defense and settlement (at the Indemnifying Party's expense). The Indemnified Party may participate in the defense or settlement of such a claim with counsel of its own choice and at its own expense; however, the Indemnifying Party shall not enter into any settlement agreement that imposes any obligation on the Indemnified Party without the Indemnified Party's express prior written consent. DoorDash assumes no liability, and shall have no liability, for any infringement claim pursuant to Section 8(iii) above based on Merchant's access to and/or use of the DoorDash Platform following notice to Merchant of such an infringement claim; any unauthorized modification of the DoorDash Platform by Merchant; or Merchant's combination of the DoorDash Platform with third party materials which otherwise would not result in such infringement claim.

9. **LIMITATION OF LIABILITY.** Except with respect to amounts payable to third parties under Section 8 ("Indemnification"), to the extent permitted by applicable law, (i) neither party will be liable to the other under this Agreement, for indirect, special, punitive, lost profits, or consequential damages, WHETHER BASED ON TORT, CONTRACT OR ANY OTHER LEGAL THEORY, and whether or not such party has been advised of the possibility of such damages, and (ii) each party's maximum aggregate liabilities related to or in connection with this Agreement shall not exceed the total amount paid or payable by one party to the other party in the twelve (12) month period immediately preceding the incident giving rise to the liability. The foregoing disclaimer shall not apply to the extent prohibited by law.

10. **USE OF MERCHANT CONTENT AND TRADEMARK; DATA PRIVACY.**

(a) During the Term, Merchant grants to DoorDash a royalty-free, non-exclusive, limited, revocable, non-transferable, non-sublicensable right and license to use and display Merchant Content in the provision of services to Merchant. If DoorDash determines, in its reasonable discretion, that particular Merchant Content, Merchant Product or Merchant Store would subject DoorDash to undue regulatory or health and safety risk or risk of liability, then DoorDash may without prior notice remove such Merchant Content, Merchant Product and/or Merchant Store from the DoorDash Platform. DoorDash will use best efforts to provide Merchant advance notice of such changes where practicable. DoorDash shall cooperate in good faith with Merchant to restore such Merchant Content, Merchant Product(s) and/or Merchant Store to the DoorDash Platform as soon as reasonably possible and as reasonably practicable.

(b) For clarity, DoorDash Data is the Confidential Information of DoorDash. Merchant agrees not to access, collect, store, retain, transfer, use or otherwise process in any manner DoorDash Data, including Personal Information, except as required to perform under this Agreement. Merchant shall keep DoorDash Data secure from unauthorized access and maintain the accuracy and integrity of DoorDash Data in Merchant's custody or control by using appropriate organizational, physical and technical safeguards. If Merchant becomes aware of any unauthorized access to DoorDash Data, Merchant will immediately notify DoorDash, consult and cooperate with investigations and potentially required notices, and provide any information reasonably requested by DoorDash. Merchant will not allow any third party to use the DoorDash Platform; copy, modify, rent, lease, sell, distribute, reverse engineer or otherwise attempt to gain access to the source code of the DoorDash Platform; damage, destroy or impede the services provided through the DoorDash Platform; transmit injurious code; or bypass or breach any security protection on the DoorDash Platform.

11. **TERM AND TERMINATION.** The Agreement begins on the Effective Date and continues until terminated in accordance with this provision. Either party can terminate the Agreement for any reason with thirty (30) days' prior written notice at any time during the Term. Neither party will be required to pay any fee in connection with a termination by either party, regardless of the reason for such termination. Neither Merchant nor DoorDash will be liable to the other as a result of termination or expiration of this Agreement for any damages or losses, including without limitation damages or losses for the loss of goodwill, loss of profits or anticipated income, on account of any expenditures, investments, leases or commitments, or for any consequential damages, restitution or expectation damages. In the event of termination, each party shall remain liable to the other for any amounts earned or owing under this Agreement.

12. **PROMOTION FEE AND TAXES.** For each Order, Merchant will pay DoorDash the Promotion Fee stated on the cover page, calculated as a percentage of the pre-tax subtotal for each order ("Promotion Fee"). Merchant shall be responsible for all taxes, duties, and other governmental charges on the sale of Merchant Products under this Agreement and remitting such taxes, duties, and other governmental charges to the appropriate authorities. Merchant agrees to provide true and correct information on Exhibit A, which is incorporated into this Agreement.

13. **PAYMENT PROCESSING TERMS.** Merchant agrees to be bound by the Stripe Connected Account Agreement, which includes the Stripe Services Agreement. The information provided on the cover page is necessary to establish Merchant's Stripe Connected Account, and it can be updated at any time.

14. **TITLE.** Merchant agrees that DoorDash does not acquire or holds title to, or acquires any ownership interest in, any Merchant Products.

15. **PARTNER CODE OF CONDUCT.** Merchant agrees to comply with the Partner Code of Conduct: https://www.doordash.com/partner/code-of-conduct

16. **GENERAL PROVISIONS**. Nothing in this Agreement is to be construed as creating an agency, partnership, fiduciary, or joint venture relationship between DoorDash and Merchant. Unless otherwise expressly set forth in this Agreement, each party shall be responsible for its own costs (including such costs as may be associated with its own personnel, locations, technology infrastructure, and other resources necessary for such party's performance hereunder). This Agreement represents the entire agreement between DoorDash and Merchant with respect to the subject matter hereof and supersedes all prior agreements and communications of the parties, oral or written, with respect to the subject matter of this Agreement. The waiver by any party of any breach or default will not constitute a waiver of any different or subsequent breach or default. All provisions of this Agreement which by their nature should, or by their express terms do, survive or extend beyond the termination or expiration of this Agreement shall so survive and extend. In the event of any dispute between the parties regarding any matter, the parties consent to exclusive jurisdiction in the courts of San Francisco County, California or the United States District Court for the Northern District of California. Neither party may assign this Agreement, or any of its rights or obligations under this Agreement, without the prior written consent of the other party, which consent may not be unreasonably withheld, and any attempted assignment without such consent will be voidable at the election of the non-consenting party; provided that either party may assign this Agreement without such consent, to an affiliate, or in connection with any merger, consolidation, sale of all or substantially all of such assigning party's assets, or any other similar transaction. Except as otherwise expressly provided in this Agreement, this Agreement will be binding upon, and inure to the benefit of, the permitted successors and assigns of each party. This Agreement does not and will not confer any rights or remedies upon any person other than the parties and their respective successors and permitted assigns. If any provision of this Agreement is held to be invalid, illegal or unenforceable for any reason, such invalidity, illegality or unenforceability will not affect any other provisions of this Agreement, and this Agreement will be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

17. **DEFINITIONS.**

a. "Confidential Information" means any confidential or proprietary business, technical or financial information or materials of that the Discloser provides to the Recipient in connection with this Agreement, whether orally or in physical form,

c. "Discloser" means the party disclosing Confidential Information.

d. "DoorDash Data" means any information that DoorDash provides or makes accessible to Merchant through the DoorDash Platform, including Personal Information.

e. "DoorDash Platform" means DoorDash's online marketplace platform using web-based technology that connects Merchants and Customers.

f. "Eligible Franchisee" means a franchisee of Merchant that has signed the Supplemental Agreement attached as Exhibit B.

g. "Customer" means the end user accessing the DoorDash Platform to view and search for the menus of merchants and place Orders.

h. "including" means "including without limitation."

i. "Indemnified Party" means the party receiving the benefit of indemnification, and its subsidiaries and affiliates, and their respective officers, directors, shareholders, employees, and agents

j. "Indemnifying Party" means the party that is indemnifying the Indemnified Party.

k. "Losses" means any and all claims, damages, losses and expenses, including reasonable attorney's fees.

l. "Materials" means a party's programs, services, data, hardware or other materials.

m. "<u>Merchant Content</u>" means (without limitation) the Menu(s), photographs (either provided by Merchant or on Merchant's website), trademarks, logos and other materials provided by Merchant to DoorDash.

n. "<u>Merchant Products</u>" means all products offered for pick up or delivery at Merchant Stores.

o. "<u>Merchant Stores</u>" means the Merchant locations that are within any then-current territory serviced by DoorDash.

p. "<u>Menu</u>" means the listing of Merchant Products.

q. "<u>Order</u>" means the order for food, beverage, or other available items [2] that a Customer places on the DoorDash Platform.

s. "<u>Personal Information</u>" means any information obtained or provided through the DoorDash Platform that (i) identifies or can be used to identify an individual (including names, telephone numbers, addresses, signatures, email addresses or other unique identifiers); or (ii) that can reasonably be used to authenticate an individual (including name, contact information, precise location information, access credentials, persistent identifiers and any information that may be considered 'personal data' or 'personal information' under applicable law).

u. "<u>Program</u>" means the use of the DoorDash Platform by Merchant, Merchant Stores, or Eligible Franchisees.

v. "<u>Promotion Fee</u>" means the commission that DoorDash receives in exchange for promoting and featuring the Merchant and the Merchant Store(s) on the DoorDash Platform.

w. "<u>Recipient</u>" means the party receiving Confidential Information.

x. "<u>Representatives</u>" means the Recipient's employees, officers, directors, consultants, agents, independent contractors, service providers, subcontractors and legal advisors.

y. "<u>Term</u>" means the period from the Effective Date until the Agreement is terminated.

*The remainder of this page is intentionally left blank.*

**EXHIBIT B**

**Supplemental Agreement for Franchisees**

This Supplemental Agreement ("Supplemental Agreement") between DoorDash and Franchisee is effective as of the Franchisee Effective Date. DoorDash and Franchisee agree as follows:

| | |
|---|---|
| DoorDash, Inc. ("DoorDash") | _____ ("Franchisee") |
| Signature: | Signature: |
| Name: | Name: |
| Title: | Title: |
| Date: | Date: |
| Address:<br><br>DoorDash, Inc.<br><br>901 Market St, Suite 600<br><br>San Francisco, CA 94103<br><br>Notices: legal@doordash.com | Address: |

| |
|---|
| Franchisee Effective Date: [Month / day / year]<br><br>Section 8 required information:<br><br>Stripe Connected Account Representative Name:<br><br>Stripe Connected Account Representative Date of Birth (MM/DD/YYYY):<br><br>Employer ID Number (EIN): |

1. DoorDash-Merchant Promotion Agreement. Franchisee's franchisor ("Merchant") has entered into the Demand Generation Agreement ("Agreement") attached hereto. The Agreement provides that Franchisee may elect to participate in the DoorDash Platform, provided that Franchisee executes this Supplemental Agreement. Accordingly, to participate in the DoorDash Platform, Franchisee agrees to be subject to all terms and conditions of this Supplemental Agreement and all terms and conditions of the Agreement, as the same may be amended from time to time by DoorDash and Merchant, which are incorporated into this Supplemental Agreement by reference. For clarity, unless otherwise indicated in this Supplemental Agreement, all references to "Merchant" in the Agreement shall be deemed to include both Merchant and Franchisee. All references to "Merchant Stores" shall be deemed references to Franchisee's

Stores. Any other agreement between DoorDash and Franchisee related to the subject matter of the Agreement or this Supplemental Agreement is hereby terminated as of the Franchisee Effective Date. Under no circumstances shall anything in this Supplemental Agreement be construed to authorize Franchisee to amend, modify or adjust the Agreement between DoorDash and Merchant. Franchisee agrees it has had the opportunity to review the Agreement, which is available from Merchant or DoorDash.

2. Eligible Franchisee. Franchisee represents that it is an "Eligible Franchisee" as defined in the Agreement. If an Eligible Franchisee ceases to possess rights as a franchisee of Merchant then, as soon as DoorDash is notified of such rights being lost, DoorDash may terminate this Supplemental Agreement. Merchant or Franchisee may also terminate this Supplemental Agreement upon thirty (30) days prior written notice to DoorDash and DoorDash may terminate this Supplemental Agreement upon thirty (30) days prior written notice to Franchisee, for any reason in its sole discretion. Termination of this Supplemental Agreement for either of the above will not be considered a breach of the Supplemental Agreement or the Agreement. Nothing in this Supplemental Agreement or the Agreement is intended to prevent DoorDash and a former Eligible Franchisee from entering into a new agreement following termination of this Supplemental Agreement.

3. Customer of Record. Franchisee will be solely responsible and liable to DoorDash to pay all Promotion Fees, payments, fees, charges, and taxes associated with the DoorDash Platform utilized by Franchisee, in addition to complying with the Franchisee's other obligations under the Agreement and this Supplemental Agreement. Franchisee will be DoorDash's customer of record for the DoorDash services provided under this Supplemental Agreement. Any breach of this Supplemental Agreement or the Agreement by the Franchisee will not be considered a breach by Merchant of the Agreement.

4. Term and Termination. This Supplemental Agreement shall commence on the Franchisee Effective Date and will expire upon the earlier of: (a) the date of the expiration or termination of the Agreement; or (b) the date the Supplemental Agreement is terminated pursuant to Section 2 above.

5. Franchisee Contact. Notices under this Supplemental Agreement to Franchisee shall be sent to the location and contact set forth above. Franchisee shall send notices as indicated in the table above.

6. Disputes. Notwithstanding Section 16 of the Agreement, the venue for any dispute between DoorDash and Franchisee must be in the city and state of the Franchisee Store from which the dispute arises, or, to the extent the dispute does not arises from a specific Franchisee Store, then in any city or state where there is a Franchisee Store owned by the undersigned Franchisee.

7. Entire Agreement. This Supplemental Agreement, including the incorporated Agreement, sets forth the entire agreement between DoorDash and Franchisee with respect to the subject matter hereof. This Supplemental Agreement supersedes and replaces in its entirety any agreement entered into between DoorDash and Franchisee for the Franchisee Stores prior to the Franchisee Effective Date.

8. Payment Processor Agreements. DoorDash uses a payment processing service to remit weekly payments to Franchisee. In order to facilitate this process, Stripe establishes a Merchant Stripe Connected Account on Franchisee's behalf. Franchisee agrees to be bound by the Stripe Connected Account Agreement, which includes the Stripe Services Agreement ("Stripe Agreements"). DoorDash will cover the cost of all payment processing fees, including any Stripe fees. Notwithstanding any contrary provision in the Stripe Agreements, DoorDash will be responsible for chargebacks and the cost of all payment processing fees, including any Stripe fees. The information provided above is necessary to establish Franchisee's Stripe Connected Account, and it can be updated at any time.

**DOORDASH APPENDIX I**

PARTICIPATING LOCATION(S)

The Parties agree the store locations listed below are participating in this Supplemental Agreement. Additional participating Merchant locations may be added to or removed from the Program at any time by mutual agreement of the parties, which may be manifested by an exchange of emails.

**LOCATION #1**

Store #:

Store Name:         Omnity Consulting LLC

Store Address:      100 W 124th St